Statement of the Case.
MONROE, C. J.
Plaintiff sues for $15,000, as damages alleged to have been sustained by an alleged illegal and malicious arrest, which he attributes to defendant, who reconvenes and claims a like sum, upon similar allegations. The trial judge rejected both demands, and plaintiff has appealed.
From the conflicting testimony that we find in the record, we conclude that the facts out of which the litigation has arisen were as follows;
When the case was tried, plaintiff was about 20 years of age, being one of the younger members of a family which owns a lot in the town of Pearl River, upon which stands a building, wherein, as we infer, the now deceased head of the family kept a store, and which immediately adjoins a lot owned by defendant, who is past 60 years of age and has also been, and is now, a merchant of the town.
Some eighteen months prior to the oc- ■ currences out of which this suit has arisen, *748 the Heitcamps moved to New Orleans; but, as there still remained some of the stock and appurtenances of the mercantile business in the store, they, now and then, made trips over there, partly for business and partly for pleasure, as we infer, and passed the day at the store building, which, for the purposes of this suit, they now call a residence, though there were no sleeping accommodations in it, and, as we understand, they did not sleep there. The defendant, it appears, conceived the idea that the fence which was supposed to mark the line between his lot and that of the Heitcamps did not accurately discharge that function, but was located upon his side of the line, and, after having an ex parte survey made, he caused it to be removed to, what his surveyor advised him was, the proper place, a proceeding which attracted the attention of Mrs. Heitcamp, during one of her trips, and led her to say to defendant that, when her sons came over, they, would show him something about it. Thereafter, on a Sunday morning, as defendant and his son were passing-the place, in a buggy, on their way from the railway station to defendant’s residence, plaintiff hailed him, and, among other things likely to lead to the severance of diplomatic relations, if not to war, “poked his finger” in defendant’s face, and accused him of trying to steal his (plaintiff’s) mother’s land, whereupon defendant “hopped” out of the buggy and advanced towards plaintiff, and, just then, either defendant, or his son, Islous, or “Gus,” the brother of the plaintiff, “grabbed,” from the whip socket of the buggy, an oak stick, which was serving the purpose of a whip, and which was then broken in a scuffle between Islous and Gus. Plaintiff, as we infer, being normal of hearing and sight, was of opinion that he could hear defendant’s explanation, if he was advancing with a view of making one, or, if he contemplated showing him anything, could appreciate the demonstration, quite as well without absolute juxtaposition, and he therefore moved back a few feet. Defendant says that it was Gus who plucked the stick from the socket, and, as we understand him, retained one end of it when it was broken, and “came down to hit me” (him) on the head, “but missed me” (him); and that, about then, he saw “this boy, Vittur (a friend of the Heitcamps) coming with a (baseball) bat, whereupon he made off up the street, * * * after Mr. Coleman” (who was the town marshal).
The marshal, it appears, was at home, indulging in a nap, and defendant (as we gather by putting the various statements together) met Mrs. Coleman and Hartman, the last named being the deputy marshal, to whom he said that he wanted them (meaning Hartman and the marshal, probably) “to walk down the street and see what was the matter.” In the meanwhile, Islous had also left the scene of action, in the buggy, and, missing his father and Hartman, had reached Coleman’s house by way of an alley, and, taking Coleman into the buggy, was driving back when they overtook the other two, who also got into the buggy,' and, thus, they all went back together. On arriving at the Heitcamp’s, Coleman and Hartman went into the building, and Coleman asked Mrs. Heitcamp what was the matter, whereupon he was told that he had no business there and was ordered out, and plaintiff, it is said, made a move to get a gun, which was standing in the corner of the room, and was arrested, and there was then a general disturbance, during which the two officers exhibited their pistols, and another member of the family seized the gun and covered them with it. Finally, the marshal started off, with the young men under arrest and the other members of the family following in their wake and expressing their views. Among others, the suggestion was made that the marshal should also arrest the Willises, which he did, informing them that they were *750 under arrest, and instructing them to “come along,” which they did, and they all proceeded to a certain sycamore tree, beneath the shade of which they rested while the marshal telephoned to the mayor, who instructed him to release those who had been arrested on parole; and, so, but for this suit, the affair came to an end.
According to the marshal, the message that he received, through his wife, came from Hartman, and was to the effect:
“That there was a disturbance down the street, and that Mr. Willis and Heitcamp were having a general disturbance. Immediately after I got up,” he continues, “Ilous (or Islous) Willis drove through the alley at my house, and I got in the buggy with him and asked him to drive me down the street to where the disturbance was, as quick as possible. Hartman had gone ahead of me. * * *
“Q. When you went to the Heitcamp’s place, did you go there for the purpose of arresting anybody? A. No, sir; just to quash this disturbance and see about it. And, after I got there, disturbance was going on, and I went in and insisted on having a quiet house. Q. Did anybody ask you to go and make the arrest? A. No, sir. Q. What kind of a building is that? A. Store building, is what it was used for, goods in it, no beds put up for sleeping, some furniture for sale. It has been used as a general store ever since I have known it.”
Opinion.
On the Motion to Dismiss the Appeal.
[1] Defendant has filed a motion in this court to dismiss the appeal, on the ground that the surety on the appeal bond was not a resident of the parish of St. Tammany. It is said in the brief of his counsel that:
“The residence of the surety is not stated, but the evidence filed in this court shows that he was a registered voter in the city of New Orleans at the time he signed the bond.”
We find no evidence, “filed in this court,” save that which is contained in the transcript, which of course, could not have been taken upon the issue raised by the motion, filed after the transcript was lodged here. The proper place to file such a motion is in the trial court, and the proper time is before the return of the appeal. When, however, the motion is filed in this court (as to the admissibility of which we consider it unnecessary to express any opinion), it should be set down separately, in order to afford an opportunity for the taking of testimony, either in the trial court, or here, as this court might order. We consider it too late to inquire into such a matter after the submission on the merits. The motion is therefore overruled.
On the Merits.
[2] Our conclusion is that defendant’s object in seeking the marshal, and the purpose of the marshal in calling upon the Heitcamps, was merely to preserve the peace and to enable defendant to pass through the street to his home without further molestation. The arrest, we think, was superinduced by the violence of the Heitcamps, and in any event was not a matter for which defendant can be held liable in damages.
Judgment affirmed.